Good afternoon. Thomas Otake on behalf of Doug Farrar, Jr. Thank you for the opportunity to argue this case today. You know, our position is that this was just not the case in which Mr. Farrar, Jr. received a fair trial. As you are aware, we've raised really numerous issues on appeal, each of which have their own merit, but of course as a whole, collectively, the cumulative effect of is that Mr. Farrar did not receive a fair trial. In terms of which issues to focus on given our time constraints, I'll just start with a couple that I think are probably on the more compelling side, and that would be first the issue of the Pinkerton instruction being given. I think it's clear that that instruction should not have been given and did not apply in this case. I think that was clear at the time of the trial. It's clear that Pinkerton played no role here, but did it, how did it make any difference? Is there any reasonable chance the jury misused it? Because in order to interfuse the Pinkerton theory, they first would have to find that he was participant in the conspiracy, and if that was the charge, it doesn't seem to go anywhere. I mean, how does it harm anything? Sure, and I think the first thing, you know, to point out is what I'm sure everyone is aware of. Because we objected to the instruction at trial, really it's the government's burden to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict. So, you know, legally it's respectfully probably a more appropriate question for the government given that it's their burden, but however, I do have some thoughts on that, of course. You know, I think you have to look at, you can't talk about this without talking about the strength of the evidence in this case. So, I think you start there. I mean, really, this was a case that dealt with the credibility of one witness, one cooperator, Steven Shigemoto, who initially upon arrest said nothing about Mr. Farrar Jr., and then a couple of days later in a debrief proffered session, said, you know, said a little more without much details, and then decided not to cooperate for three or four years until he was a couple of years into probably a 135-month sentence he wasn't enjoying, and then he came back to cooperate. The case hinged almost entirely on his credibility. There was, of course, some effort to cooperate his testimony, but to your question, you know, with that in mind, you know, the case really came down to four trips to the mainland that Mr. Shigemoto admitted to going and packing drugs for. The third and fourth trip, even he admitted Doug Farrar Jr. was not there, was not involved. The, and it kind of gets into the other issue. He communicated with him during that trip. You're correct. That's what he said, is that there was some nominal communication with Farrar Jr. on that trip. However, you get into the to wit language in the indictment, in which mentions the drugs, which was seized from the fourth trip that Mr. Farrar Jr. was not at. And if you put that all together, when you give the jury an instruction that says, you know, in part, if one member of the conspiracy commits a crime in furtherance of the conspiracy, the other members have also under the law committed that crime. I understand your point that... What's the other crime that they might have convicted him of under the Ingriden instruction other than the fourth trip and the drugs from the fourth trip is what the concern would be. If a juror rationally thought, which I think they could have given the fact that Farrar Jr. was not there, if the jurors thought that he was not involved in that fourth trip, and if the jurors thought that Mr. Shigemoto obviously was, and if the jurors thought that Mr. Shigemoto's commission of that offense made Farrar Jr. guilty of it, even though he wasn't there, then I think... Use that Pinkerton theory without first finding that he had joined the very conspiracy charged in the indictment. I understand your point, Your Honor. I think our point is that the language in and of itself is confusing enough where perhaps that language could have led to jurors thinking, because of the fourth trip and the involvement there, that there was a conspiracy, again, because the You raise a separate issue on there, but the problem with that theory is that it says, you know, beginning, and then the beginning date is 2013, well before the fourth one, and so it obviously alleges some broader conspiracy over a longer period of time, and therefore all of the other things are part of that departure from the indictment. I understand, Your Honor. I think as it relates to this Pinkerton issue, though, the fact that the indictment did specify the drugs from the fourth trip, and then now you have this Pinkerton instruction that obviously should not, I mean, in our opinion, obviously should not have been given. Your theory is that the Pinkerton instruction allowed them to get out of the fourth trip into the first, second, or third. I think what I'm suggesting is the Pinkerton instruction may have confused the jurors into believing that even if they thought Mr. Farrar Jr. was not involved in the fourth trip, if Mr. Shigemoto was involved in the fourth trip, then somehow they could hold Mr. Farrar Jr. responsible for the fourth trip because of Pinkerton liability on the part of the actors. There still has to be a conspiracy, either as to the fourth or something. There still has to be a conspiracy before they could pick up Pinkerton. I understand your point, Your Honor. I guess our point is that the instruction obviously should not have been given, and it is ripe for confusing jurors who aren't well versed in, you know, this law and conspiracy law. And it adds to the confusion because the two-way language in the indictment specifies the drugs from the fourth trip. And can we sit here and say beyond a reasonable doubt that that absolutely played no role in their conviction? And I mean, it seems to be a separate argument. You're trying to kind of suggest that the two-way language could have confused the jury, but the jury's not looking back at the indictment. The jury's looking at the evidence presented. I mean, there may be, you have a separate argument that the evidence shouldn't have been presented given the indictment. But if we don't accept that, then I don't understand how the two-way language helps you on the Pinkerton for jury confusion. Right. I mean, I think the point is that when you're looking at the evidence in the case, Shigemoto's testimony was that Farrar Jr. was there on trips one and two, and was not there on trips three and four. And you know, his testimony about Farrar Jr.'s actual whatever communication was not much. And so the concern is if you have this Pinkerton instruction, regardless of the wit language, you have drugs that were actually seized from the fourth trip, making it, you know, of course more, I guess, provable or reliable to the jury that, you know, than the other three is you actually have actual drugs. And you have Shigemoto involved in trip four, and arguably Farrar Jr. not, the Pinkerton instruction could cause some confusion. And I don't think we can say beyond a reasonable doubt that it did charge were possession or possession with intent to distribute specifically the fourth shipment. I understand your argument. And I don't know that I can ask you to anything more, but that's not the conviction we're dealing with here. You have to go back to the conspiracy conviction. Right. And you don't get into triggering Pinkerton until you've gotten past the notion of conspiracy. So I want to make sure I understand what you're saying. How is it the jury could have been confused by this to reach the conclusion there was a conspiracy? Leaving aside the fourth shipment in particular, it seems to me that the instruction couldn't push the jury toward finding there's a conspiracy because that's the first step they're required to do to trigger the Pinkerton instruction. I understand your point, your honor. I think, again, I just would submit that we're all here today talking about this with the background we have in conspiracy law and experience with the case line and criminal defense and criminal law. And the jurors don't have that. And so, you know, I don't think it's unreasonable to suggest that when you give an instruction that has no legal application and a layperson reads it, that someone could read that without this legal background and think that, well, if Shigemoto was involved in the fourth trip and even though Farrar Jr. wasn't, well, maybe that means they're in a conspiracy and maybe therefore we can hold him accountable for it. So I understand your point, though, but our point is that if you look at it from the perspective of the government's burden to prove beyond a reasonable doubt, that's obviously a really high standard. And I just don't think we can say that. You know, if the standard was lower, maybe, you know, I think your points obviously are valid ones. I, a while ago I did trials and it's sort of a three ring circus and you're trying to spin the plates all over the place and you lose track. And I did not, it's been a few days, but I remember looking back at the discussion there and I don't recall anybody saying to the district court, you know, this really doesn't belong here because the charge is conspiracy. It's not something else holding a co-conspirator responsible for a particular crime. Was that ever brought up in the discussion? The instruction was objected to. I know the instruction was objected to, but I'm not sure that, and again, I understand what goes on in a trial, but I'm not sure the district court was ever presented with the most obvious thing that seems to us on reflection to suggest, well, this really has no place here because the only charge defendant is accused of is conspiracy, not this possession with intent to distribute itself. So just curious as to how it came about. That's all. Understood. You know, as to some of the other issues, if it's okay to move on, you know, the restriction of cross-examination of Mr. Shigemoto, we thought was obviously problematic and error. And I go back to the strength of the evidence I talked about earlier. You know, there's no doubt that his reliability and credibility is what mattered in this case. And factually, you know, the way it came about, you know, to initially not say anything, to say a little at a proffer, and then to decide not to cooperate, and then later decide to cooperate, the government understood that to be a problem with his credibility and sought to cure that problem by pointing out why he chose not to cooperate because he was afraid of being a snitch in prison. So with that being said, you know, the fact that we were trying to make, which we think is a problem, at the time, when he chose not to cooperate and he wants to say it's because he didn't want to, he thought he was gonna be a snitch and received some bad treatment in prison, an alternative explanation that's reasonable is that he really didn't have anything truthful to say about Farrar Jr. And so the 10-year mandatory minimum, why that matters, I hope it was clear in our briefing, is even with that motivation, if he, knowing he was facing a mandatory minimum of 10 years, and the only way to get below it was to cooperate, and he still chose not to cooperate, with that motivation, well, it's because he didn't have anything truthful to say about Farrar Jr. I mean, that's what the argument would have been. If he knew, knowing he was facing 10 years, if he had something truthful to say, he would have said it, because he was facing 10 years. And so, I mean, I think that was... I'm not going to add very much to the cross-examination you're able to do over the years. After he sat in prison a few years, he decides to come in, and he's the whole case, and you can cross him, you know, quite effectively, that he has a very strong motive to tell a false story to get a reduced sentence, and I don't see that this really adds very much what you weren't allowed to add, and the jury didn't agree, but that's why we have trials. Right, and, you know, I would respectfully, you know, suggest, when we're looking at the law, when it comes to, you know, restricting that kind of cross-examination, I mean, we don't need to show it would have necessarily succeeded. We just need to show that it might reasonably have questioned the witness's reliability or credibility in light of the cross-examination, and that's the Farrar versus Sacramento case. But you have to take into account countervailing, you know... I guess that's part that really kind of concerned me, Your Honor, throughout the trial. I mean, we were always focused on concerns over the prejudice to the government, and it never really flowed the other way. I mean, the exact same thing could be said. The jury knew he got a 135-month sentence, so why did it prejudice the government if they would have known he had a 10-year mandatory minimum? I mean, we weren't doing it because we somehow, therefore, the jury would think Mr. Farrar was going to get a 10-year man in and nullification by a party. They knew he got 135 months. It goes to the human element of motivation at the time he decided not to cooperate. But if we know he got 135 months and the jury knows that, I'm not sure how it strengthens the notion of what his motivation was at the time that there was a mandatory minimum of something different out there. It's the dynamics of how the system works. And I think we all know this, right? The charges he was facing, there was a mandatory minimum of 10 years and he would not be able to get below it without cooperation. That's the argument. Not that he had a long sentence and he maybe could have got less. He could not have broken 10 years without cooperating, and he chose not to. And they want to say it's because he didn't want to be a snitch. But we're saying he chose not to, even with that huge motivation of facing 10 years or more, because he didn't have anything truthful to say. I'm sure you made that argument as it was. I just don't know how the mandatory minimum affects that. You could fairly say and obviously did say that he was facing a substantial sentence. Look at the sentence he got. That really comes in for when he decides to tell a story the government likes and look at the benefit he got from that. But I'm really not sure I understand what how the mandatory minimum the first time around adds to the scale. Because it's the dynamics of human motivation and if you know you're facing 10 years versus hey you might get a big sentence, you might not. I mean that's different. And you know the analysis here again is you know under the fifth and sixth amendment, you know, full and fair cross-examination. It hinged on might it reasonably cause a juror to question his reliability if we're able to get into that. And I don't see how we can say that it might not have done that. I mean it's a valid argument and it's much more powerful than it is just to say well he knew he was facing time and he thought he could have got less. I mean it's a much more powerful element because it's and it's the 404 B issues. I was confused. Your brief seemed to suggest that the government introduced both the methamphetamine prior and the marijuana prior. Are you contending? Are they right on that? It was the same case, right? It was the same case. I don't want to misspeak but if I recall correctly, although there was, I think the conviction was for marijuana. There was evidence that the house had methamphetamine in it at the time in 2006. They contend you raised both and say that they violated 404 B on their part as to both but then they came back and said no, we only introduced the methamphetamine. And that was once the courts, again my recollection is once the court decided that she was letting it in, then of course the fact that it was really primarily a marijuana case, you know, we thought would mitigate against. One last thing. That would eliminate, if the government didn't bring in the marijuana aspect, then that 404 B argument only goes to the methamphetamine. That's what I'm trying to understand. You argued both but I didn't see the factual basis for arguing it as to marijuana. And again, you know, I just point out to all these cumulative issues, you know, the jury deliberated for two and a half days and, you know, so that's what we have to say. I guess that if it's possible to reserve some time. Yeah, I could save a minute or two. Thank you. Thank you. Miss Purcell. Thank you. Had a busy week as well. What's that? You've had a busy week as well. I've had a very busy week and I'm kind of proud to be the person who both started and ended your week of oral argument. I think that's kind of fun. I suppose I should start with the Pinkerton and perhaps the Twit clause. Did the government propose the Pinkerton instruction? Yes, your honor. Why on earth did you propose such an instruction in this case? It has absolutely nothing relevant to it. I'm with you, your honor. The Pinkerton instruction, we all understand now, I think, that Pinkerton goes from conspiracy to substantive act, not the other way around. And this was a conspiracy case. And so it is a little bit unusual to have asked for that instruction. It's not just unusual, it's irrational. My understanding is that the reason that that instruction was requested was precisely because the prosecutor was concerned that the defense was going to try to cut off the third and fourth trips from the first and second trips. That's actually his theory of prejudice. It is his theory of prejudice, but it's not a theory that makes sense. You thought it made enough sense that you proposed it to try and not prejudicial? Well, it's also not an argument that was made at trial. It's an argument made now. I mean, that's, you know, we don't know how things are going to play out when we're up front talking about what jury instructions we want. We don't know what arguments are going to play out. And as it turns out, the defense did not argue that only the fourth trip was charged or that the jury should not convict because the defendant wasn't personally involved in the fourth trip. That doesn't actually come up during the trial at all. But today... That went to the scope of the conspiracy. It still doesn't happen. Asking for a pink instruction in a conspiracy only case is borderline frivolous. And I would just hope we wouldn't see something like this again. I understand, Joanna. I absolutely understand. It remains true, though, that it's really difficult to think of any way in which the inclusion of that fingerprint instruction could have hurt anything. It's legally completely correct. And to the extent that it has any applicability here, it probably would be to ensure that the jury understands that the conspiracy is one thing in this case that covers at least the four trips. Something that... Can you point us to any other cases where a Pinkerton instruction has been used in a case where it's a conspiracy only charge and the courts addressed this issue? No, Your Honor. And I say that with some... It's that unique of a mistake that no one else has ever addressed it. Well, there certainly have been cases. There have been many cases in which courts have confused the import of Pinkerton and have believed that Pinkerton had an application in a conspiracy case. That's a pretty basic mistake, honestly. But I don't remember one where a Pinkerton instruction was given in the context of a conspiracy case. Well, isn't that the problem we face? Because it was given here. And Mr. Taki's argument is that the prejudice is that it might have encouraged a jury to convict on conspiracy when they might not have otherwise. And you're trying to bridge a gap here. You're trying to say, well, there was a reason why it got pushed forward, even though it shouldn't have been. But that seems to weigh against the notion that it was harmless beyond a reasonable doubt. Because, in fact, if it could have encouraged a jury to convict on conspiracy, if it could have assured them that they didn't have to limit themselves to any particular shipment, isn't that a problem? No, Your Honor. It's really not. Because one of the things that my learned adversary ignores here is that there was a single conspiracy. And not only was there a single conspiracy among the three individuals, Farr Senior, Farr Junior, and Sugimoto, and perhaps others, not only was there a single conspiracy, but that single conspiracy clearly covered all four traps. And so for that reason alone, it's impossible for this instruction to have confused the jury in any way. And it's important to point out that that's how the case was tried. I went back just yesterday and reviewed the closings. Were the drug quantities for each of the trip, were they each individually sufficient to meet the statutory minimum for the enhanced sentence? Yes, Your Honor, I believe so. What I'm not sure of off the top of my head is whether they would meet it for both drugs. There may have been a shipment that didn't include cocaine, I can't remember off the top of my head. Might not have been, might not have met it for both drugs, but it certainly would have for methamphetamine for any one of the four trips. Now, the fourth trip, of course, is the one where... The 50 grams of methamphetamine in all four? That is my recollection. To be honest, I probably have to go back to make absolutely sure, but that's my recollection. Because these were very, very large shipments. And the fourth shipment, the one that was seized, was 32 pounds of methamphetamine. And they used the same kind of packaging. So without actually looking at the testimony, I'm pretty confident that they were very substantial each of them. And of course, again, because that fourth shipment was actually seized, that's the one that was actually weighed and for which we have a lab report. The obvious reason why it was included in the... It was referred to in the indictment. So I think my position on the Pinkerton instruction is pretty simply that it couldn't have confused the jury. It was legally correct. And for that reason alone, couldn't have confused the jury. And as one or more of your colleagues pointed out, since it assumes the existence of the conspiracy, it can't confuse. And because the only charge of the case was conspiracy, there's no reason to believe that it would have confused someone into convicting of the conspiracy, which was the prerequisite for the application of the instruction. Okay. I want you to organize your comments on the other issues, including those raised by the defense. But at some point, I would like you to speak to one of the sentencing issues that hasn't been discussed so far. And in particular, the obstruction of justice enhancement. Because as I read the transcript, although it's pretty darn clear what it was the court was thinking, I don't actually see there a finding of fact that the court made that the defendant had testified untruthfully. The language used compares the witness's testimony, the defendant's testimony, to the verdict of the defendant, who obviously didn't believe him. And the court moves on pretty quickly. Is it a problem if the court itself did not make a finding of fact that there had been obstruction of justice? The first of all, the court did make a finding of fact that there had been an attempt to obstruct justice by testifying falsely. Do you know where I would find that? Excerpt of record 1462. Castro Ponce requires explicit findings that not only did the defendant give false testimony, but also that the falsehoods were willful and material to the criminal charges. Where did she make those explicit findings as to those two elements? Excerpt of record 1462. The district judge said first that the jury believed Mr. Sugimoto and could not possibly believe Mr. Farr and have a conviction. How does that make a willful? That's the next. That's the next. This one covers the first two elements that the jury found essentially found beyond a reasonable doubt that Rodrigo was lying because they couldn't possibly have believed him and convicted given the nature of his testimony. They couldn't have convicted. They must have believed beyond a reasonable doubt that his statements were false. And that same sentence underscores the materiality of that attempted obstruction. Literally what the district court said is not even a finding that she thought that it was false and willful. All it is, is he took the stand, testified contrary to the allegations that were put forward by Mr. Sugimoto. The jury believed Mr. Sugimoto and could not possibly believe Mr. Farr and have a conviction. So the testimony that was given by Mr. Farr was an attempt to obstruct justice. And the court finds those two points were appropriate. So that plugs in. That's not how I read Castro poems. Two things about that. One is that the objection that was raised here was to the obstruction of defense, adjustment, I'm sorry, was a flat objection. There was no detail to it whatsoever. And the district judge literally, I object, that's it. So the district judge essentially thinks here, this is a no the jury's found beyond a reasonable doubt that's a higher standard than what the judge herself thought. The problem with that is there's a lot of times where a jury makes a factual decision that implies that one witness is only consistent with one witness's version of events and is inconsistent with And, you know, I think that's the problem here is there's a whole bunch of intervening steps that are left out. Now, it may have been apparent at the time, it may have been clear to the district court because of how Farrar testified that, you know, he was lying, all those things may have been true. But that's not what we're seeing in the record. So that is, that's what's troubling. How do we distinguish this? What the district did here from any other case where a jury makes a finding that's inconsistent with the testimony of the witness? We could have a production of justice charges for almost every, every defendant that's convicted that they testified. Um, and in fact, it is appropriate in not every time the defendant testified, but in many of them for the same reasons that it's appropriate here. But if a defendant didn't testify completely inconsistently with the verdict, that here it was, um, it was, it was material because it went directly to the mission. Okay. But I agree with everything you're potentially saying. Problem is the district court didn't make that finding. The district court didn't even make the finding. I think she did. I think that when she, when she commented on the jury's reaction, um, if she disagreed with it, she clearly would have said so, at least it's clear that he lied. It is absolutely clear that he lied. It's clear because we know that if you were, um, if the jury believed them, then they would have acquitted. They had to acquit, which makes it, um, both his testimony false, um, and material. And with respect to the third element, the willful intent, I mean, for one thing, it's, it's, it's hard to argue it's not you get up and you say, I didn't do it. I wasn't there. Um, I, uh, I, I was, it was a coincidence that I was on a flight twice. We shouldn't go to the back of Hawaii, et cetera, et cetera. It's hard to argue that it's not willful. Um, and so the only question here really is, I agree with all of what you're saying. It's, it's, it would have been a relatively simple case to take. It wasn't, it wasn't made and it wasn't on the record at that. I mean, every argument you're making now could be made about every defendant who has a verdict against them. But a lot of them, they're giving testimony that is discounted or rejected. But I mean, there's a lot of factors that go into a jury decision and not all of those are automatically, oh, the witness was lying. Uh, you know, this case seems to be a strong case for that, but there wasn't a finding. Um, your Honor, I really disagree with the proposition that there wasn't a finding here. Um, what I haven't quite gotten to is the focus on the last part of that quote, the testimony that was given by Mr. Tuara was an attempt to obstruct justice. It's not fleshed out in detail, but then, you know, it's a also though, I think we need to keep in mind that the word attempt in attempt to obstruct justice, the word attempt carries with it, um, just as it does for the crime of it, of attempt, it carries with it the intent, the specific intent to accomplish the result. And that's willfulness. That's willfulness. So while it really consists of one word, the word attempt to obstruct justice, it's still a finding, um, that there was willfulness. That's how you would distinguish this case. If the district court had said he's guilty of obstructing justice, that would have been problematic. But because he said, uh, because he said, uh, attempt to obstruct justice, that makes it a finding of fact that fits within our prior case. It's, it is the, um, it is a shorthand way of making a willful intent, uh, finding. That's, that's what it is. Is there, um, in, if there aren't any other specific areas that, um, I probably should go back to, uh, the, the restriction. I just had a quick question about an issue that hasn't come up in that. Why, why was Farrar Sr. asked, uh, during cross-examination why he went to trial? What was the purpose of that cross-examination? What was it trying to accomplish? Um, I'm having a little bit of trouble hearing you, so I'm hoping I got that question right. Um, I'm wondering why Farrar Sr. was cross-examined as to the fact that he went to to put in front of the jury about Farrar Sr. Um, the sequence of events there was that, um, on the first question on, um, the first question of that series on cross-examination was whether he had pled guilty to the earlier offense. There was no objection to that question, and so it was answered in, in the affirmative. Um, the prosecutor merely wanted to complete the, the circle with, with the facts that were, uh, were going on there as opposed to, um, um, as opposed to making any payout. He just wanted to make clear that there was, well, because remember, at that point, the, the jury already knows that he did plead guilty, but, and so just to tie up the loose ends, what happened in the second one, he went, he, and it was, of course, could have been asked if he had the conviction. Why, why was it brought up that he chose to go to trial? I think it was just to, just to clear it up, uh, what, you know, the fact of what happened. I don't think there was any, you know, deep, um, result motive or ulterior motive for that. Uh, there was a, again, it was clear that he had pled guilty once, he had two prior convictions, he had gone to trial, and it was worded in terms of he expressed his constant delight to go to trial, and then after that, it was dropped completely. You know, there's no further examination about it. Um, and it seems, um, I think it's pretty clear that when no one made any payout of that, uh, the fact that he went to trial, nobody accused him of closing or cross-examination or anything else of, uh, of being, uh, wasting time at the court, of lying, or, you know, any, any negative, uh, inference from the fact that he exercised his constitutional right to go to trial. Um, it, it seems like, at a minimum, it's, there's no prejudice whatsoever, uh, to Burrell Jr. in the fact that Burr Sr. had, as Burr Jr. was doing, uh, at that time, exercised his constitutional right to go to trial. Yeah, I mean, what the, um, uh, government said at trial is that, quote, it did not want to leave the jury with the impression that Burr Sr. had taken responsibility for his drug trafficking when he had gone to trial. True, but that argument wasn't actually made to the jury. The, the jury was merely told that he had gone to trial. Right, but the delta between just telling the jury that he was convicted and that he went to trial is to sort of patch that inference, his exercise of constitutional rights. I can't tell you how the, I can't tell you how the jury heard it, but I, because I'm not inside their minds, but I can tell you that no argument was made to take advantage of that fact or cast aspersions, uh, on Burr Sr. In fact, if I remember correctly, the prosecutor didn't mention Burr Sr.'s testimony, uh, or if he did, it was, it was very, very, very quick mention without, without going into any of that sort of thing. I'm almost out of time. Do any of your honorees have questions about anything else? I don't think so. Thank you so much. Thank you. Um, uh, Mr. Otake, and we'll give you a little bit more time if you need it. I think you've got a minute. Thank you. You know, the reason why Mr. Burr Sr. was asked that is because the prosecutor wanted to discredit him for not taking responsibility and coming to court and, and, and, um, testifying that this actually happened, but I didn't plead to it. I fought it. And the inference was, you know, he, he didn't take responsibility. He fought it. And now he, now you want, now you want to, um, to believe him? He's not believable. He should have done that. And our point was, if you're going to do that, number one, that shouldn't be allowed. But if you're going to do that, at the very least, we should be able to ask him, well, what would, well, that's their version. Why did you go to trial? And he was going to say, because at my age, with my health, I was looking at 20, 30 years, it was a life sentence. It wouldn't have mattered much. I just figured I didn't want to And so if they're going to discredit him by suggesting that, surely he was a critical witness to us and we, he should have been allowed to explain that. And that deprived us of an opportunity to rehabilitate. You know, on the couple of things on, on the Pinkerton issue, you know, um, the government's comments as to why they requested it is, is exactly what our concern was. And it goes exactly to what we're saying, you know, in the first instance, regardless of this two-wit argument that we make, which we think is valid. Even if you go with the concept that it was a broader conspiracy, the Pinkerton instruction could have confused the jury into, um, in a prejudicial way. If you go even further and you, and we're right about the two-wit language of the indictment saying it was a more narrow conspiracy, what the Pinkerton instruction could have done is made the jurors think, okay, well, maybe there was, you know, two conspiracies going on and maybe Farrar Jr. was involved in trips one and two and not four. But if Shigemoto was involved in four, then Pinkerton says, and, and, and therefore, um, it leads to further confusion. The jury is instructed at the beginning of, of the instructions that they, they, they are to apply the law as the judge gives it to them. And the inclusion of that instruction obviously, um, was, um, a signal to them that that's part of the law they need to apply. And therefore, you know, um, we can't assume that they did not consider it and it did not affect their deliberations. So, um, you know, I thank you all for your time. And, um, unless there's other, uh, questions, I'll stop there and ask that you consider all of these things on their own, but also the cumulative effect of all of it. Um, thank you. Thank you. Thank you, counsel. Thank you to both of you, uh, for your
judges: Clifton, Nelson, Collins